IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANNEMARIE BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-042-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Gary L. Smith, Esquire of Newark, Delaware. Counsel for Plaintiff.

David C. Weiss, Esquire, United States Attorney and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, District of Delaware. Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel and Sandra Romagnole, Esquire, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: May 19 , 2011
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Annemarie Brown ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to award her DIB benefits. (D.I. 13) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 15) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB on May 28, 2003 alleging disability since August 31, 2001 due to fibromyalgia, severe headaches, lower back and neck pain, severe left arm pain, partial loss of use of the left arm and memory loss. (D.I. 11 at 28, 34, 44) Plaintiff was 44 years old on the onset date of her alleged disabilities and 46 years old at the time her application was filed. (*Id.* at 44) Her initial application was denied on December 4, 2003 and upon her request for reconsideration on July 30, 2004. (*Id.* at

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides[.]

42 U.S.C. § 405(g).

28, 34) Plaintiff requested a hearing, which took place before an administrative law judge ("ALJ") on August 2, 2004, which hearing took place on March 4, 2005. (Id. at 22, 39) On March 16, 2005, the ALJ issued a decision denying plaintiff's application for DIB. (Id. at 8-21) Following the unfavorable decision, plaintiff timely appealed to the Appeals Council. (Id. at 7) On September 14, 2006, the Appeals Council denied plaintiff's request for review (id. at 4-6) and the ALJ's decision became the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Plaintiff thereafter filed a civil action in this court pursuant to 42 U.S.C. § 405(g) seeking review of the ALJ's denial of plaintiff's claim for DIB. (Civ. No. 06-649-JJF) On cross-motions for summary judgment, the court remanded the case back to the ALJ "to address several troubling aspects of [his] decision," namely: (1) the ALJ's reliance on the absence of a physician's evidence regarding plaintiff's work restrictions as an inference that no restrictions exist; (2) unexplored conflicts in medical evidence, specifically, the opinions of J. Brandon Ph.D.; (3) the vocational expert's ("VE's") lack of discussion regarding plaintiff's test scores (regarding cognition) on plaintiff's ability to perform work. See Brown v. Astrue, 590 F. Supp. 2d 669, 645-76 (D. Del. 2008).

A second ALJ conducted a hearing on October 15, 2009, at which plaintiff and independent VE Mitchell A. Schmidt ("Schmidt") testified. On October 30, 3009, the ALF issued an adverse decision to plaintiff. On January 19, 2010, plaintiff brought the current action for review of the final decision denying plaintiff DIB. (D.I. 2)

### B. Plaintiff's History

Plaintiff is currently 53 years old. Plaintiff has an eleventh grade education and a

2

certificate from Delaware Technical Community College. (D.I. 11 at 278) She has two sons, aged 26 and 24 years old, and has custody of her granddaughter. She has been married since February 2001. Plaintiff alleges disability since August 31, 2001, and was insured for disability through March 31, 2006.[2] (Id. at 79, 108, 118, 122, 131)

Plaintiff's past work experience includes work as a dispatcher (between 1981 and 1996) and a property manager at an apartment complex. (Id. at 65, 279-80) Plaintiff worked as a property manager between 1999 and 2001, at which time she was managing 84 apartment units.[3] (Id. at 131) Plaintiff's work duties included screening Section 8 tenants, leasing apartments, supervising maintenance, computer work, and walking the property three or four times a day. (Id. at 418)

A few months prior to the time plaintiff stopped working, she reported to the emergency room ("ER") with complaints of anxiety. (Id. at 105) The cause was not specified. Plaintiff stated that, at the time of her separation from her employment, she could no longer perform many of her job duties, such as walking around the property and make written reports, due to pain and forgetfulness. Plaintiff was told by her boss, who had already hired a replacement, that she should quit or otherwise be terminated. (Id. at 83, 134)

Plaintiff attributes the onset of her pain to an accident that occurred in 1990 while

---

[2]To establish a period of disability for which DIB may be awarded, a plaintiff must have disability insured status for that period. See 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a); 404.131(a). Plaintiff does not contest defendant's representation of the relevant time period in this case.

[3]Plaintiff worked for the apartment complex from 1997 to 2001; it is not clear what her title was between 1997 and 1999. (D.I. 11 at 65)

3

plaintiff was working for Acme Markets.⁴ At that time, plaintiff lifted a crate of melons and immediately experienced neck and left arm pain, as well as numbness in her arm. (Id. at 64, 131, 396) According to plaintiff's physician, Dr. Pierre L. LeRoy, plaintiff was diagnosed with a herniated disk in her neck resulting from that accident. (Id. at 396) Plaintiff states that her pain has worsened over the years and that she has pain in her neck, back, left arm, elbow, and hand, and has headaches as well as forgetfullness. (Id. at 81, 131)

## C. Medical Evidence

The court has previously described in detail plaintiff's physical and mental impairments, and the court incorporates by reference its prior resuscitation of the relevant facts. See Brown, 590 F. Supp. 2d at 671-72. The court describes below the medical evidence emphasized by plaintiff in her current papers.

On January 29, 2002, physician Dr. William L. Jaffee treated plaintiff for neck pain and referenced prior visits in this regard. In this record, Dr. Jaffe states his belief that plaintiff's neck pain results from esophageal spasm. (D.I. 11 at 111) He noted briefily plaintiff's fibromyalgia and muscular pain. Dr. Jaffe also provided that plaintiff reported an inability to do manual work with her arms.⁵ With the exception of these notes, plaintiff admits that she has no medical records dated between January 29, 2001, the date of alleged disability onset, and March 19, 2003.

---

⁴It is not clear for how long plaintiff was employed with Acme Markets, or how this fits in with her prior dispatcher position.

⁵It is not clear from the record that this is an objective finding, as compared to the resuscitation of a subjective complaint received from plaintiff.

4

On March 19, 2003, Dr. Alvin Lloyd of Wilmington Neurology Consultants, P.A. provided a neurological consultation. Plaintiff presented with a history of headaches (approximately once per week) that increased in November 2003 (to about four per week).[6] (*Id.* at 174) Plaintiff complained of dizziness, slurred speech and nausea accompanying her headaches. (*Id.*) She also complained of forgetfulness and upper extremity pain from the shoulder to her fingertips. (*Id.* at 175) Plaintiff was prescribed Elavil.[7] (*Id.*)

On May 14, 2003, plaintiff again treated with Dr. Lloyd who remarked that plaintiff: (1) did not take an ordered cerebral MRI; (2) reports her chest pain resolved; (3) experienced "dramatically successful" results with Elavil;[8] (4) has had no headaches other than upon ingestion of beer ("and that's happened on only two occasions!"); (5) still complained of symptoms of the left upper extremity; and (6) had no more speech or other difficulties discussed in March. (*Id.* at 172-73) The cerebral MRI was cancelled and an EMG/nerve conduction study was ordered for the left upper extremity symptoms. (*Id.* at 173) Thereafter, plaintiff filed for DIB on May 28, 2003.

Plaintiff saw Dr. Lloyd again on June 3, 2003 for an appointment following a call to his office on May 30, 2003, wherein plaintiff complained of a swollen left arm and a

---

[6]While Dr. Lloyd noted in 2003 that plaintiff had previously seen a Dr. Yacoub, been diagnosed with fibromyalgia by Dr. Jaffe, and had a herniated lumbar disc in her history (D.I. 11 at 175), these records are not before the court and plaintiff has, as mentioned above, conceded that they are unavailable.

[7]Generally, an antidepressant.

[8]Dr. Lloyd stated that he expected improvement of plaintiff's headaches with Elavil but was "frankly somewhat surprised by the magnitude of the improvement, and quite pleased." (D.I. 11 at 172)

5

feeling like "bugs were crawling" on it, as well as complained of toes going numb. (*Id.* at 170) At the office visit, plaintiff did not discuss her toes, but complained of the strange sensation in her arm and weakness in the arm, and of recurring headaches. (*Id.*) Dr. Lloyd suspected complex regional pain syndrome (or reflex sympathetic dystrophy), and added a prescription for Neurontin.[9] (*Id.*) Plaintiff had an EMG on June 13, 2003. The EMG showed chronic denervation changes in the radial C5, C6 muscle, which was deemed to be "probably. . . [the] result of chronic C6 radiculopathy." (*Id.* at 166)

Plaintiff was seen again by Dr. Lloyd on July 14, 2003, at which time she complained of numbness in her right hand, pain in the upper left arm, low back pain, and numbness in her right toes. (*Id.* at 164) Dr. Lloyd continued to suspect reflex sympathetic dystrophy but noted that plaintiff presented none of the typical abnormalities upon examination. (*Id.* at 165) He ordered a MRI of plaintiff's cervical spine and an EMG of the right extremity. (*Id.*)

On July 18, 2003, Dr. Lloyd sent a letter summarizing his findings with respect to plaintiff to plaintiff's counsel. Dr. Lloyd stated that, "[a]lthough I continue to feel that reflex sympathetic dystrophy in the left upper extremity is likely, it appears that a left C6 radiculopathy is also present." (*Id.* at 162) Dr. Lloyd also provided that

> [i]t is my impression that the patient is totally unable to work at present. The preponderance of my treatment is related to the patient's accident of 1990. Basically, all symptomatology in the left upper extremity and cervical spine could be attributed to that injury.

---

[9]Generally, a drug (gabapentin) that may be used for certain aches and pains.

6

(Id. at 163)[10]

Plaintiff received the MRI on July 20, 2003. The MRI revealed the following: (1) straightening of the normal cervical lordosis; (2) spondylotic annular bulge and "mild to moderate bilateral neural foraminal stenosis as well as mild central canal narrowing," with "no definite deformity of the spinal cord," at the C4-C5 level; and (3) small annular bulge as well as "uncovertebral hypertrophy causing mild to moderate bilateral neural foraminal narrowing" at the C5-C6 level. (Id. at 116) The impression of the reviewing physician was "spondylotic and degenerative changes in the cervical spine as described predominantly effect the C4-5 and C5-6 levels." (Id. at 117)

Dr. Yakov U. Koyman of the Delaware Neurosurgical Group, P.A. examined plaintiff on August 15, 2003. Dr. Koyman reiterated plaintiff's complaints that her symptoms (and severe left arm pain) started in November 2002. On examination, plaintiff stated that the pain was still significant. (Id. at 118) Plaintiff also told Dr. Koyman that medication did not control her pain. (Id.) Dr. Koyman opined that plaintiff has degenerative cervical spine disease and suggested that plaintiff start physical therapy. (Id. at 119)

Plaintiff was evaluated by Dr. S. M. Iqbal, a psychologist with the Delaware Disability Determination Service on November 30, 2003 in connection with her claim. Dr. Iqbal conducted a clinical psychological evaluation and performed a memory test. (Id. at 130) Dr. Iqbal reported on the employment, family history and history of medical

---

[10]Plaintiff received worker's compensation benefits for the 1990 accident, which have expired. (D.I. 11 at 396) Dr. Lloyd's letter of June 18, 2003 appears to relate to another claim, although it is not clear from the context of his letter.

problems provided by plaintiff. Dr. Iqbal's report noted in detail plaintiff's level of self-sufficiency with respect to household duties and self care, and noted plaintiff's claims of isolation and depression. (Id. at 133-34) Plaintiff was aware, pleasant and able to communicate. Dr. Iqbal reported that "[plaintiff's] memory is intact," although plaintiff relayed several examples of forgetfulness. (Id. at 134) Plaintiff received the following Weschler Memory Scale scores:

| Test | Score | Rank - Percentile |
|------|-------|-------------------|
| Auditory Immediate Index | 77 | 6th |
| Visual Immediate Index | 106 | 66th |
| Immediate Memory Index | 89 | 23rd |
| Auditory Delayed Index | 83 | 13th |
| Visual Delayed Index | 112 | 79th |
| Auditory Recognition Delayed Index | 55 | 0.1% |
| General Memory Index | 84 | 14th |
| Working Memory Index | 76 | 5th |

(Id. at 135) Dr. Iqbal reported that plaintiff's visual immediate index and visual delayed index scores were in the average range; the immediate memory index, auditory delayed index and general memory index were in the low average range; and the auditory immediate index and working memory index were in the borderline range. (Id.) "There are significant intersubscale score variations, which may be interpreted as the result of [plaintiff's] depression and anxiety, affecting her concentration and attention span, and also affected by her complaints of constant pain." (Id. at 136) Dr. Iqbal completed a

8

psychological funcational capacities evaluation form, which does not appear to be of record. (Id.)

Plaintiff continued to treat through 2004. She received another MRI of the cervical and lumbar spine on August 23, 2004 which revealed: (1) straightening of the cervical spine; (2) degenerative disc changes at C4-C5; (3) "no cord impression or compression" at C4-C5; (4) "tiny central disc protrusion" at C3-C4; (5) degenerative disc changes at L2-L3; (6) a right intraforaminal disc herniation at L4-L5; and (7) broad-based disc bulging at L5-S1. (Id. at 215)

Plaintiff had a consultation with Dr. Pawan Rastogi of Neurology Associates, P.A. on September 14, 2004. Dr. Rastogi noted that plaintiff had a 5/5 strength but a tender back with diminished range of motion. Plaintiff's "MRI shows multilevel degenerative disc disease with a small bulging disc at L4-5 and L5-S1. There is no significant root compression." (Id. at 270) Dr. Rastogi referred plaintiff to physical therapy and recommended steroid injections; surgery was not recommended. (Id.)

Plaintiff again saw Dr. Lloyd on December 23, 2004, whose record indicates that plaintiff had yet to see a pain management specialist and reported that her headaches were "not that bad." (Id. at 254) Plaintiff denied pain in her right hand but noted numbness. (Id.) She had a positive Tinel's sign.[11] (Id.) Plaintiff stated that she had been diagnosed by a rheumatologist with osteoarthritis. (Id.) Plaintiff tested positive for Lyme disease. (Id.) Dr. Lloyd recommended Paxil,[12] physical therapy for neck and

---

[11]A medical test for detecting irritated nerves, performed by tapping over the nerve to elicit a sensation at the nerve's end.

[12]Generally, a medication to treat depression or anxiety.

back pain, treatment with a pain management specialist, and an EMG to diagnose the numbness in plaintiff's hands. (*Id.* at 255)

Following the office visit with Dr. Lloyd on December 23, 2004, plaintiff cites no further medical evidence through March 31, 2006, or the date plaintiff's coverage lapsed. Plaintiff again started treating in preparation for her second ALJ hearing. (D.I. 14 at 7) She had a MRI taken in April 2008 and treated on three occasions with Dr. Eva Geracimos between November 7, 2008 and February 2009. Dr. Geracimos ordered another MRI in February 2009. Plaintiff thereafter was evaluated by Dr. Pierre L. LeRoy who, on October 5, 2009, prepared a report in which he opines that plaintiff is unable to work. Specifically, Dr. LeRoy noted that "[c]urrently, [plaintiff] is not able to work and is on total temporary disability." (*Id.* at 400) He later proffered an opinion that, "based on [a] reasonable [degree of] medical probability, it appears that the [1990] accident as related, lifting the crate of cantaloupes, is sufficiently significant to produce the current symptoms that have been outlined in the diagnosis[.]" (*Id.* at 401)

## D. Plaintiff's Self-Assessments

In her papers, plaintiff cites to several capacity assessments of record which she avers were not considered by the ALJ on remand, and the court briefly describes them here, in chronological order. (D.I. 14 at 13)

The first document is titled "Disability Report" and is dated May 28, 2003. In this detailed report, plaintiff described her 1990 accident and current complaints of pain. For example, plaintiff stated that she suffers from: (1) fibromyalgia; (2) severe headaches; (3) memory loss; (4) balance loss; (5) lack of sleep; (6) loss of use of the

10

left arm; and (6) back pain. (D.I. 11 at 63) Plaintiff indicated at this time that she weighed 152 pounds. (*Id.*) Plaintiff also indicated that she is forgetful, miserable, withdrawn and finds it hard to function. (*Id.* at 64) According to plaintiff, she left her job in 2001 because her fibromyalgia was affecting her sleep, she was becoming very forgetful at work, and she was experiencing esophageal attacks that would only feel better after drinking several beers, which her doctor told her was acting as a muscle relaxer. (*Id.*)

Plaintiff also cites a daily activities questionnaire dated September 18, 2003. In this questionnaire, plaintiff indicated that she is able to wash clothes, but needs help with putting them in the dryer. (*Id.* at 75-76) Plaintiff also cooks dinner, but said that she could do very little housework, gets little sleep and has put on weight. Plaintiff goes to the grocery store once a week but with her husband for assistance. (*Id.* at 75) She cannot bend to vacuum, put things on low shelves or bend to wash floors. (*Id.* at 75, 77) She needs help getting in and out of the bathtub and cannot brush her hair. (*Id.* at 80) Plaintiff stated that she reads a half hour per day, and often needs to re-read something several times to understand. (*Id.* at 78) Plaintiff watches 2 to 3 hours of television a day and is too depressed to socialize. (*Id.* at 78-79) Plaintiff provided that she and her husband have custody of her (then-) two year old granddaughter, and that a friend has moved in to help with the child. (*Id.* at 79)

The next cited document is a pain questionnaire filled out by plaintiff on September 22, 2003 in connection with her claim for benefits. Plaintiff indicated at this time constant pain in her left arm (a "sharp" pain), both legs ("shooting" pain), right hand

11

("throbbing" pain) and lower back ("burning" pain). (D.I. 11 at 98) She indicated that standing, sitting, walking and exercise increase her pain. (*Id.*) Plaintiff also indicated: (1) loss of appetite; (2) very little sleep; (3) irritability and lack of desire to socialize; (4) difficulty with household chores requiring bending over; (5) more than 6 hours a day spent lying or sitting down due to pain; and (6) experiences of fatigue, depression, anxiety, and withdrawl. (*Id.* at 99-100)

Plaintiff also cites a document entitled "Disability Report – Appeal" dated August 5, 2004. (*Id.* at 91-97) In this report, plaintiff described her conditions as "severe lower back pain and neck pain," with a "hard time bending over or sitting down," "pain in [her] bones" in her back, and left arm and leg pain. (*Id.* at 91) She adds that since her last disability report, she has a new condition of osteoarthritis with chronic pain. (*Id.*) Plaintiff provided that she cannot kneel or bend, such as to tie her shoes, cannot get out of the bathtub by herself, and cannot lift weights such as a laundry basket, a small saucepan, or her grandchild. (*Id.* at 95) Plaintiff also claimed to be able to stand no longer than four minutes and sit no longer than four to six minutes. (*Id.* at 95, 96)

### E. Hearing on Remand

While plaintiff states that the ALJ did not consider her testimony at the second hearing, plaintiff does not iterate what testimony was not considered in this regard, and the court declines to summarize the lengthy transcript here. (D.I. 14 at 13) Plaintiff cites testimony from her first hearing as evidence in support of her argument that the ALJs failed to account for her obesity. Specifically, plaintiff states that she testified at the first hearing that she is five feet, five inches tall and 200 pounds. (*Id.*) Other

12

relevant hearing testimony will be discussed within the context of the discussion to follow.

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

13

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If she is not, then the ALJ considers in the second step whether the claimant

14

has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

15

## B. The Prior Decision and Remand

The first ALJ determined that plaintiff suffered from cervical degenerative disc disease, left arm and shoulder pain, depression and obesity, which are "severe" impairments, that these impairments did not meet or medically equal a listing. See *Brown*, 590 F. Supp. 2d at 673. The ALJ also found plaintiff's allegations regarding her limitations "not totally credible" in view of her physicians' records. *Id.* Finally, relying on testimony from an independent VE, the ALJ concluded that plaintiff had the residual functional capacity to perform a significant range of light work and, therefore, is not disabled within the meaning of the Act. *Id.*

Judge Farnan remanded the case for several distinct reasons. First, the court took issue with the ALJ's statement that "no treating or examining source stated that [plaintiff's] impairments were totally debilitating or rendered [plaintiff] completely unemployable." *Id.* at 675. That statement was deemed inconsistent with the record – specifically, Dr. Lloyd's statement in July 2003 that plaintiff "was unable to work at present" – and the governing legal principles. *Id.* Further, the court noted that the ALJ did not explore a conflict in the record evidence between a Dr. Brandon's opinion with that of a Dr. Tucker-Okine, the latter's opinion having been given weight by the ALJ, while the former's was ignored. *Id.* Finally, the court stated that it had concern regarding the VE's silence regarding the impact of the memory test scores obtained by Dr. Iqbal on plaintiff's ability to perform work. More particularly, the VE did not understand the significance of these scores. *Id.* at 676. Thus, the ALJ should have sought further clarification on the issue, and a remand was appropriate. *Id.*

## C. ALJ's Determination on Remand

On remand, the ALJ issued thirteen pages of findings of fact and conclusions of law. At step one, the ALJ found that, through the date last insured (March 31, 2006), plaintiff had three severe impairments: degenerative disc disease; depression; and obesity. (D.I. 11 at 317) The ALJ determined, however, that none of the foregoing severe impairments met or medically equalled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (*Id.* at 319) The ALJ further determined that plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) which was "simple and routine in nature, and provided for occasional changes in position to relieve postural discomfort and entailed occasional use of her non-dominant upper extremity." (*Id.* at 321) The court does not reiterate the entirety of the ALJ's detailed opinion here, but will discuss his conclusions in summary form, and provide greater detail within the context of plaintiff's arguments on this appeal.

### 1. Step two: disorder of the spine

Plaintiff's first argument on appeal is that the listing for disorders of the spine has been met and, therefore, plaintiff is presumptively entitled to benefits. The requirements set forth for disorders of the spine are as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, **spinal stenosis**, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), **resulting in compromise of a nerve root** (including the cauda equina) or the spinal cord. With:

A. Evidence of **nerve root compression characterized by** neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

17

reflex loss **and**, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.][13]

(emphasis added) Plaintiff argues that her impairment to her left upper extremity supports a finding of impairment pursuant to the foregoing. The ALJ disagreed, as follows:

[T]here was no evidence of nerve root compression or spinal arachnoiditis to the degree specified in sections 1.04A and 1.04B. More particularly, treatment records fail to document motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss.

(D.I. 11 at 319)

Plaintiff asserts that there is evidence of "compromise" of the nerve root or spinal cord (rather than "compression") in Dr. Lloyd's letter of July 18, 2003, but the court discerns no such evidence in that record. (D.I. 14 at 10 (citing D.I. 11 at 212)) In this letter, Dr. Lloyd expressed an opinion that plaintiff suffers from chronic left C6 radiculopathy, and ordered a cervical spine MRI and EMG for further evaluation. (D.I. 11 at 212) As defendant points out, the results of plaintiff's August 23, 2004 cervical spine MRI specifically state that "[n]o cord impression or compression is seen" at C4-C5 and "[n]o cord impression or compromise of neural foramina is seen" at the C3-C4 level.[14] (Id. at 214) Plaintiff does not address this record in her reply papers, instead, emphasizes that the ALJ considered results of her earlier July 20, 2003 MRI, which revealed "mild central canal narrowing at the C4-C5 level, with no definite deformity of

---

[13]Subparts B and C to this regulation, providing alternate forms of evidence of spinal disorder, are not asserted to apply.

[14]The August 23, 2003 MRI was referenced by the ALJ in his opinion, however, he did not quote these representative portions of the report. Rather, the ALJ cited the record for its positive findings. (D.I. 11 at 318)

18

the spinal cord." (D.I. 17 at 1 (citing D.I. 11 at 318)) While this record reflects mild narrowing of the spinal canal, plaintiff does not argue that spinal canal narrowing equates to nerve root compression, as required by the guidelines.

### 2. Consideration of obesity

Plaintiff next argues that the ALJ failed to consider whether plaintiff's obesity, in combination her other impairments, renders her disabled. *See Diaz v. Comm'r of Social Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) ("[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step."). Although plaintiff did not specifically claim obesity as an impairment (D.I. 11 at 28, 34, 47), the ALJ considered plaintiff's weight (of 200 lbs, consistent with a body mass index of 33) at the initial hearing in determining that obesity was a severe impairment in this case (*id.* at 318). The ALJ provided that he considered any "additional and cumulative effects of [plaintiff's] obesity under each step of the sequential evaluation process." (*Id.* at 318)

Plaintiff does not specify any particular records or other evidence that were purportedly omitted by the ALJ. (D.I. 14 at 10; D.I. 17 at 3) The court notes that ALJ described plaintiff's activities of daily living, social functioning, and concentration, persistence and pace in connection with his step three analysis; plaintiff was described as being able to perform daily living tasks with "mild restriction." (D.I. 11 at 320) At step four, the ALJ detailed the evidence of record concerning plaintiff's residual functional capacity, including a description of Dr. LeRoy's hearing testimony that plaintiff's "moderate obesity and the aging process have aggravated her condition." (*Id.*

at 322) Plaintiff's general assertion that her weight contributes to her loss of functioning is not enough to require a remand "particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding [plaintiff's] limitations and impairments." *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *compare DeWitt v. Astrue*, 381 Fed. Appx. 782 (10th Cir. 2010) (remanding for consideration on combined effects of obesity where ALJ did not mention obesity and quickly dismissed conflicting medical opinions on residual functional capacity) (cited by plaintiff).

### 3. Subjective complaints of pain

The Third Circuit has instructed that, although "[t]estimony of subjective pain and inability to perform even light work is entitled to great weight," *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.1979), an ALJ may reject a claim of disabling pain where he "consider[s] the subjective pain and specif[ies] his reasons for rejecting these claims and support[s] his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). Put another way, the ALJ must give plaintiff's subjective complaints "serious consideration" and make "specific findings of fact, including credibility, as to [her] residual functional capacity." *See Burns v. Barnhart*, 312 F.3d 113, 129 (Fed. Cir. 2002) (citations omitted).

Plaintiff asserts that the ALJ did not consider her subjective complaints of pain made either in written statements or at the hearing. (D.I. 14 at 12-13) Although plaintiff concedes that the ALJ mentioned her subjective complaints as relayed in her medical records, she argues that her physicians "take cursory notes for treatment purposes."

(D.I. 14 at 12-13) "[W]hat a doctor writes in an office note cannot be a reasonable substitute for detailed statements written in response to questions asked by social security specifically for [the] purpose of evaluating [plaintiff's] subjective complaints nor for the testimonial evidence [plaintiff] gave at a hearing." (D.I. 17 at 3)

Plaintiff argues that the ALJ omitted reference to the following documents, described *supra*: (1) plaintiff's pain questionnaire dated September 22, 2003 (D.I. 11 at 98-101); (2) disability reports, dated September 22, 2003 and August 5, 2004 (*id.* at 63-69, 91-97); and (3) plaintiff's daily activities questionnaire dated September 18, 2003 (*Id.* at 75). Plaintiff does not particularly describe any omitted claims contained therein, or how the consideration of such statements would affect the ALJ's analysis. (D.I. 14 at 12-13)

In discussing his finding that plaintiff has a "mild" restriction in activities of daily living, the ALJ noted that plaintiff reported to Dr. Koyman in August 2003 that she was a homemaker and was caring for her granddaughter, and also informed Dr. Lloyd (at the beginning of her treatment in March 2003) that she was caring for her granddaughter. (D.I. 11 at 320 (citing *id.* at 118, 175)) The ALJ further noted that plaintiff drove to her appointment with Dr. Iqbal, denied to Dr. Iqbal having issues with personal hygiene, but noted that she sometimes had difficulties with getting out of the bathtub or brushing her hair. (*Id.*) Further citing Dr. Iqbal's report, the ALJ considered that plaintiff reported performing household chores such as preparing meals and washing dishes, reading newspapers and magazines daily, but needing help with putting clothes in the dryer and can no longer vacuum. (*Id.* (citing *id.* at 133)) The ALJ also provided that plaintiff has

21

to be accompanied to the grocery store because she cannot do heavy lifting. (*Id.*) At the first hearing, plaintiff "acknowledged that she was able to take care of her personal needs and dress with some assistance, prepare simple meals, read to her granddaughter, grocery shop with her husband, drive, run simple errands and use a computer." (*Id.*)

In his step four analysis, the ALJ generally provided that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with his RFC assessment. (D.I. 11 at 322) The ALJ specifically noted that plaintiff complained to Dr. Rastogi of significant low back pain radiating into her legs on September 14, 2004, but that no straight leg raise was noted on physical examination. (*Id.* at 322-23)

Although plaintiff's testimony at the second hearing is conspicuously absent from the ALJ's (otherwise detailed) opinion, plaintiff does not identify in her papers any particular hearing testimony that was omitted by the ALJ, or how such omissions would have affected the analysis. Defendant does not claim that the ALJ discussed plaintiff's hearing testimony, only that the ALJ gave plaintiff the benefit of any doubt when he found that plaintiff's RFC was "somewhat more limited" than that assessed by the state agency consultants. (D.I. 15 at 18; D.I. 11 at 325)

While subjective complaints of pain must be given serious consideration, "pain alone cannot be the basis for a finding of disability; the subjective complaints must be accompanied by medical evidence showing the existence of a condition that reasonably could be expected to produce the alleged symptomalogy and support a finding of disability. It is [plaintiff's] burden to prove that her subjective complaints of pain are

22

substantiated by medical evidence." See Alward v. Comm'r of Social Sec'y, Civ. No. 08-3373, 2009 WL 4798263, *7 (D.N.J. Dec. 8, 2009) (citations omitted). The language of the opinion shows that the ALJ in this case considered plaintiff's subjective complaints as relayed in her medical records and rejected those complaints that were inconsistent with plaintiff's testimony regarding her functional abilities. The court is presented with no more than general arguments by plaintiff that her subjective complaints were not considered. The ALJ's opinion was sufficiently detailed to allow for meaningful review and substantial (cited) evidence supports the ALJ's determination of RFC. The court does not remand on this record.

### 4. Compliance with the remand order

Plaintiff's final argument is that a remand order is required because the ALJ did not comply with Judge Farnan's directive to further develop the record with respect to plaintiff's psychological test scores. (D.I. 14 at 14) It is defendant's opinion in this regard that the ALJ was not required to determine the vocational relevance of Dr. Iqbal's reported memory scores because the ALJ did not rely on those scores. (D.I. 16 at 19) In his opinion, the ALJ noted that plaintiff has had no mental health treatment or counseling. (D.I. 11 at 323) The ALJ provided that Dr. Iqbal found that plaintiff had normal thought content, judgment and insight, a normal affect, and related well, despite having a depressed mood. (Id.) The ALJ recited the court's concern over the inconsistency between Dr. Iqbal's statement that plaintiff's memory is intact and memory test scores, and provided that:

Dr. LeRoy has also noted that [plaintiff] had only a mild memory problem due to medication side effects. He reported that [plaintiff] was able to relate her entire medical history with no apparent difficulties [ ]. Two medical professionals have

found no significant deficits in [plaintiff's] memory. Thus, as discussed below, the undersigned agrees with the State agency medical consultants that [plaintiff] has **no more than a moderate limitation** in concentration, persistence or pace based on the evidence of record.

(*Id.* at 324) (emphasis added)

Further addressing plaintiff's mental functional limitations, the ALJ weighed the opinions of two state agency consultants and gave more weight to the opinion that plaintiff had a mild, rather than a moderate, degree of limitation in activities of daily living and in social functioning, as the ALJ found that opinion more consistent with the record as a whole. (*Id.* at 325 (citing D.I. 11 at 137-154)) The ALJ "accept[ed] the opinions of both state agency medical consultants that [plaintiff] had moderate difficulties in maintaining concentration, persistance or pace based on her mild memory impairment and variable concentration discussed by Dr. Iqbal and Dr. LeRoy." (*Id.* at 325-36) Plaintiff does not take particular issue with this analysis, only the ALJ's omission of a discussion of plaintiff's test scores. (D.I. 17 at 3-4)

As the foregoing indicates, the ALJ specifically noted Dr. Iqbal's test scores (and the court's concern over their treatment) and found Dr. LeRoy's observations persuasive evidence that the two "borderline" scores obtained by Dr. Iqbal did not affect plaintiff's RFC. Dr. LeRoy's observations constitute "such relevant evidence as a reasonable mind might accept as adequate" to support the ALJ's conclusion under these circumstances. *Pierce*, 487 U.S. at 565. The court does not reweigh the evidence of record. Notwithstanding the foregoing, the ALJ's hypothetical question to the VE provided, amongst physical and postural limitations, that "[a]ny jobs would have to be just simple and routine in nature" in order to be performed by plaintiff. (D.I. 11 at

24

424) The ALJ's treatment of the two "borderline" scores was harmless error, if erroneous at all.

## V. CONCLUSION

For the reasons discussed above, the court finds that the ALJ's decisions at steps two and four are supported by substantial evidence of record. Plaintiff's motion for summary judgment (D.I. 13) is denied and defendant's motion for summary judgment (D.I. 15) is granted. An appropriate order shall issue.